**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PETER BOOTS and CINDY BOOTS,**

                                                        **Plaintiffs,**
          **v.**                                                        **8:13cv1096**

**STANLEY BLACK & DECKER, INC.,**

                                                        **Defendant.**
_____


**DECISION & ORDER**

Thomas J. McAvoy, Senior District Judge.

        Plaintiffs Peter and Cindy Boots ("Plaintiffs") commenced this products liability

action, alleging that a defective utility knife manufactured by Defendant Stanley Black &

Decker, Inc. ("Defendant") injured Plaintiff Peter Boots.  Defendant has filed a motion

for summary judgment, which is presently before the Court.

**I.      BACKGROUND**

        This case concerns Plaintiffs' claim that Peter Boots was injured by a defective

utility knife sold by the Defendant.  As part of its motion for summary judgment,

Defendant's brief contained a statement of material facts with citations to the record.

Plaintiffs did not respond to this statement by admitting or denying any of the

statements offered by the Defendant.  Instead, Plaintiffs' brief contains another

statement of material facts with citations to the record.  Defendant responds to each

paragraph of this statement supporting any denials with appropriate citations to the

record.

Local Rule 7.1(a)(3) requires that a party who moves for summary judgment file a "Statement of Material Facts" that "set[s] forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." L.R. 7.1(a)(3). The opposing party is then required to file a response, "admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Id. The Rules are clear that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis in original). Plaintiffs ignored this portion of the rules, apparently leaving it to the Court to determine which of the Defendant's facts the Plaintiffs disputed.

The responding Statement of Material Facts is not a mere formality, and the courts apply Rule 7.1(a)(3) strictly. See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir. 2005)(upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir. 1998)(per curiam)(accepting as true material facts contained in unopposed local rule statement of material facts); Meaney v. CHS Acquisition Corp., 103 F. Supp.2d 104, 108 (N.D.N.Y. 2000)(deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations

2

– specific or otherwise – to the record")(emphasis in original); <u>McKnight v. Dormitory Auth. of State of N.Y.</u>, 189 F.R.D. 225, 227 (N.D.N.Y. 1999)(McAvoy, J.)("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); <u>Osier v. Broome County</u>, 47 F. Supp.2d 311, 317 (N.D.N.Y. 1999) (McAvoy, J.)(deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

The Court therefore declines to sift through the factual materials that Plaintiffs have submitted in an effort to find factual support for their arguments in response to the Defendants. <u>See</u> <u>Amnesty America v. Town of West Hartford</u>, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); <u>Monahan v. New York City Dep't of Corrections</u>, 214 F.3d 275, 291 (2d Cir. 2000)(The Court's Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted). Pursuant to Local Rule 7.1(a)(3), the Court will deem all properly supported facts in the Defendant's Statement to be admitted.

According to the facts properly supported by the Defendant, the subject utility knife when sold is equipped with a series of six snap-off style blades that each contain eight snap-off segments. (Defendant's Statement of Material Facts, dkt. # 39-2 at ¶ 1). A user can therefore use up to forty-eight sharp blades without having to open the knife

and load a new blade. (Id.). The knife is an auto-load-auto-locking device. (Id. at ¶ 2). A "blade slider" permits the user to control the length of the blade or retract the blade in to the housing when not in use. (Id. at ¶ 3). The auto-locking mechanism on the knife is contained in this blade-slider button. (Id. at ¶ 4). The auto-lock mechanism is actuated by a spring loaded L-shaped pawl. (Id. at ¶ 5). This mechanism locks the blade in place by means of a physical engagement between the L-shaped lock pawl and barrel engagement teeth in the knife housing. (Id. at ¶ 6). The knife's packaging contains warnings and instructions. (Id. at ¶ 11).

The knife also contains a "blade clamp," which is designed to reduce lateral motion when a blade is in the cutting position and to wipe the blade of potential contaminants when a user retracts the blade into the housing. (Id. at ¶¶ 7, 10). The blade clamp is not designed to lock the blade in place, and it cannot do so. (Id. ¶ 8). The function of the blade clamp does not affect the performance of the auto-lock mechanism. (Id. at ¶ 9).

Plaintiff Peter Boots was hired by DaMaCo Windows in December 2009. (Id. at ¶ 12). Plaintiff's hiring came through the Iron Workers Union. (Id.). Plaintiff worked on a number of window installation jobs before suffering the injury that led to this litigation. (Id.). The job in question occurred at Salmon River High School. (Id.). Plaintiff's training and experience made him familiar with window installation. (Id. at ¶ 13).

At the time of his injury, Plaintiff was attempting to install a vinyl jamb along the right side of a classroom window at Salmon River High School. (Id. at ¶ 14). The jamb was approximately seven feet long and five inches wide. (Id. at ¶ 15). The jamb's width was bordered by 1/4 inch flanges that formed a c-shaped channel. (Id. at ¶ 16).

4

Plaintiff and other DaMaCo employees pre-cut the jambs to match the height of the window involved.  (Id. at ¶ 17).  About half of the jambs needed to be "notched" to make the jamb lie flat and not contact the factory-welded seam on the top and bottom of the window corner.  (Id. at ¶ 18).  Plaintiff had been trained to "notch" the jamb, cutting the flange in two places per notch and then using pliers to snap off the flange between the cuts.  (Id. at ¶ 19).

Plaintiff testified that he used the subject knife just before the accident, extending a blade so that one to one-and-a-half segments were exposed.  (Id. at ¶ 20).  One blade segment is .4 inches of blade exposure.  (Id. at ¶ 21).  Thus, one and one-half blade segments amount to .6 inches of blade exposure.  (Id. at ¶ 22).

Plaintiff attempted to cut a notch in a vinyl jamb.  (Id. at ¶ 24).  The utility knife's blade became stuck in the vinyl while Plaintiff attempted to cut the fourth cut in the jamb.  (Id.).  Plaintiff attempted to free the blade by holding the jamb upright in his left hand and pulling the blade with his right.  (Id. at ¶ 25).  This method for freeing the blade put Plaintiff's left arm in the path of the blade.  (Id. at ¶ 26).  The blade came free from the jamb, and Plaintiff cut his left arm between the wrist and elbow to a depth significantly less that .4 or .6 inches.  (Id. at ¶¶ 27, 22).

Owen Swamp, who witnessed the incident, testified that he picked up the utility knife immediately after the accident.  (Id. at ¶ 28).  He kept the knife in his possession until he gave it to the Plaintiff.  (Id.).  He returned the knife to the Plaintiff in the same condition as it was at the time of the accident.  (Id. at ¶ 29).

There were a number of different methods that Plaintiff could have used to free the knife from the jamb.  (Id. at ¶ 31).  He could have pushed the blade away from his

body, which would have prevented the accident.  (Id. at ¶ 31).

Plaintiffs' counsel on June 27, 2014 represented to the Court that their expert had not yet inspected the knife.  (Id. at ¶ 32).  Counsel stated that he hoped to avoid any claims of prejudice by the Defendant that could come if the knife were damaged by the inspection.  (Id.).  Moreover, the knife would need to be opened by both sides to ascertain the functionality of the blade locking mechanism at issue.  (Id.).  Despite this representation, on July 17, 2014, Plaintiffs' expert inspected the knife outside the presence of any representative for the Defendant.  (Id. at ¶ 33).

A joint inspection was conducted on August 14, 2014.  (Id. at ¶ 34).  The joint inspection revealed that the knife contained two full blades with eight segments each.  (Id.).  The blades were in the housing unit.  (Id.).   No partial blades remained inside the knife, and none were preserved by the Plaintiff.  (Id. at ¶ 36).  No physical evidence indicates that the blade broke.  (Id. at ¶ 37).

The August 14, 2014 inspection also revealed that the lock pawl component, which engages with the knife's barrel teeth when performing the auto-lock function, had migrated from its assembly position.  (Id. at ¶ 38).  This migration of the lock-pawl prevents the auto-lock feature from working as designed.  (Id. at ¶ 39).  The design of the blade slider and the auto-lock mechanism means that there is no escape geometry by which a lock pawl can exit the slider once properly assembled.  (Id. at ¶ 40).  According to Plaintiff's expert "[m]y inspection and dimensional analysis of the subject slider confirmed that there was no damage to the slider and no escape geometry exists by which the lock pawl can exit the slider."  (Id. at ¶ 41).  The knife's lock pawl cannot become dislodged, if properly assembled, unless the housing unit is intentionally

6

opened and the lock pawl is physically removed.  (Id. at ¶ 42).

## II.    LEGAL STANDARD

Defendant has moved for summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.    ANALYSIS

Defendants seeks summary judgment on Plaintiffs' claims on several bases,
which the Court will address in turn.

### A.  Applicable Law

This case, which was removed to this Court from the Supreme Court of Franklin
County, New York, raises products liability claims.  The parties agree that New York law
governs these claims.  In New York, "[a] manufacturer who places into the stream of
commerce a defective product which causes injury may be liable for such injury."
Amatulli v. Delhi Constr. Corp., 77 N.Y.2d 525, 532, 571 N.E.2d 645, 648 (1991).
Defects in a product "may consist of a mistake in manufacturing, an improper design or
the inadequacy or absence of warnings for the use of the product."  Id.  "To recover for
injuries caused by a defective product, the defect must have been a substantial factor in
causing the injury, and 'the product must have been used for the purpose and in the
manner normally intended or in a manner reasonably foreseeable.'" Hartnett v. Chanel,
Inc., 97 A.D.3d 416, 419, 948 N.Y.S.2d 282, 285 (1st Dept. 2012) (quoting Amatulli, 77
N.Y.2d at 532).

In most cases, "'the opinion of a qualified expert that a plaintiff's injuries were
caused by a deviation from relevant industry standards would preclude a grant of
summary judgment in favor of the defendants.'" Diaz v. N.Y. Downtown Hosp., 99
N.Y.2d 542, 544, 784 N.E.2d 68, 70 (2002) (quoting Murphy v. Conner, 84 N.Y.2d 969,
972, 646 N.E.2d 796 (1994)).  Still, "[a]n expert's affidavit–offered as the only evidence
to defeat summary judgment–'must contain sufficient allegations to demonstrate that

the conclusions it contains are more than mere speculation and would, if offered alone at trial, support a verdict in the proponent's favor.'" Ramos v. Howard Indus. Inc., 10 N.Y.3d 218, 224, 885 N.E.2d 176, 179 (2009) (quoting Adamy v. Ziriakus, 92 N.Y.2d 396, 402 (1998)).  If "the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force and is insufficient to withstand summary judgment."  Id.  "'Where the expert states his conclusion unencumbered by any trace of facts or data, his testimony should be given no probative force whatsoever[.]'" Amatulli, 77 N.Y.2d at 533 n.2 (quoting McLaughlin, 1971 Practice Commentary, MCKinney's Cons Laws of NY, book 7B).

B.     **Manufacturing Defect**

Defendant first argues that no evidence supports a claim that the knife was improperly manufactured.  Defendant contends that evidence shows that the L-shaped lock pawl was properly assembled and installed and removed only after the knife left Defendant's possession.  Defendant points to its expert report as *prima facie* evidence that the subject knife was not defectively manufactured and argues that Plaintiff has no evidence to rebut this showing.

In New York "'in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process.'" Preston v. Peter Luger Enters., Inc., 51 A.D.3d 1322, 1324, 858 N.Y.S.2d 828, 831 (3d Dept. 2008) (quoting Denny v. Ford Motor Co., 87 N.Y.2d 248, 257, 662 N.E.2d 730 (1995)).  "For entitlement to summary judgment on this basis, a defendant must submit admissible proof establishing that the product was

9

not defective as a matter of law." Id.  The initial burden rests with the Defendant to show that the product was not defective "when the product left the manufacturer." Id.  If the defendant meets this burden, then the plaintiff must "either submit direct evidence that a defect existed when the product left the manufacturer or, 'in the absence of evidence identifying a specific flaw, . . . prove that the product did not perform as intended and exclude all other causes for the products failure that are not attributable to the defendant[.]'" Id.  (quoting Speller v. Sears, Roebuck & Co., 100 N.Y.2d 38, 41, 790 N.E.2d 252 (2003) (internal citations omitted)).

Included in the Defendant's moving papers is Plaintiff's expert report, written by Harry Ehrlich.  (See Dkt. # 39-16).  Ehrlich reports that, along with Stanley's expert, Matthew Ponko, he examined the subject knife.  (Id. at 4).  The two found that "the subject knife made a rattling sound when shaken."  (Id.).  Upon opening the knife, they found that "the L-shaped pawl was not assembled within the slider, but was loose within the knife enclosure."  (Id.).  Without the lock pawl, the blade could not lock.  (Id.). Testing revealed that, without the pawl, the force necessary "to extend the retract blade in the supposedly locked position . . . range[d] from 0.9 pounds to 1.3 pounds."  (Id.). Stanley's testing specified that "the blade should withstand a force of 22.5 pounds in both directions and remain locked[.]" (Id.).  Ehrlich concludes that, since "there is no escape geometry by which the lock powl can exit the slider, if properly assembled," the "knife was not fully assembled when it left the factory."  (Id.).  Ehrlich notes that he examined the slider and found no damage to that part of the knife.  (Id. at 5).  He also finds that "[t]he design of the subject knife relies upon a small spring that is housed within the slider.  That spring is under compression and pushes the lock pawl into an

10

opening that allows a small segment of the pawl to emerge from the slider and engage the notches in the steel sleeve. Should the pawl not be held captive during the entire slider assembly process, that spring will push the pawl out of the slider before the slider assembly is completed." (Id.). Further, citing the design of the knife, deposition testimony, and "physical evidence, the presence of the spring in the slider, the absence of the lock pawl in the slider and the lack of escape geometry" Ehrlich concludes that "the slider was assembled in the factory without the lock pawl in place." (Id.). The lack of a lock pawl was a cause of Plaintiff's injury. (Id.).

Defendant offers Ponko's expert report, which disputes these conclusions. (See Expert Report of Report of Matthew B. Ponko, Exh. E to Defendant's Motion, dkt. # 39-7, ("Ponko Report")). Ponko points to evidence that indicates wear on the lock pawl and the knife's barrel teeth, which he contends indicates that the knife "must have been properly assembled and used for a period of time because both the lock pawl and the barrel engagement teeth contain significant wear marks." (Id. at 9).[1] The Court finds

---

[1] In opposing the motion for summary judgment, Plaintiff also provides a rebuttal report from Ehrlich. (See Exh. A to Plaintiff's Response ("Ehrlich Rebuttal Report"), dkt. # 43-1). Ehrlich disputes claims by Defendant's expert that wear marks on the lock pawl demonstrate that the knife was properly assembled. (Id. at ¶ 4). Instead, Ehrlich contends, the wear marks on the lock pawl "are consistent with the lock pawl being improperly assembled and floating loose within the barrel of the knife." (Id.). Under those circumstances, Ehrlich insists, "the lock pawl is subject to scraping against the blades, blade holder and blade slider and metal spring components within the barrel." (Id.). Similarly, wear on the barrel engagement teeth, Ehrlich finds, could have been caused by contact from tools in a toolbox, and not necessarily from repeated engagement of the lock pawl. (Id.). Ehrlich thus concludes that "the wear marks on the subject knife components confirm that the knife was never properly assembled." (Id. at ¶ 5). Defendant contends that this report is improper as it was not produced in accordance with Federal Rule of Civil Procedure 26(a) and offers a new theory of liability designed to counter a significant flaw in the original report. The Court finds that the original support was sufficient to defeat summary judgment and declines to address

that the Defendant's expert report meets the Defendant's *prima facie* burden, and that

Plaintiff's expert report provides expert evidence sufficient to defeat Defendant's

motion.  While Defendant surely offers trenchant criticism of Ehrlich's report which a

jury may find convincing, the Court finds that a reasonable juror could be persuaded by

Ehrlich's position presentation.  The jury will have to determine whether the knife was

defectively manufactured.

Elsewhere in its brief, Defendant argues that the Court must disregard Ehrlich's

report because it does not meet the standard articulated in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 573 (1993), and should not be considered.  "Under

Fed. R. Evid. 702, an expert witness, unlike a lay witness, is 'permitted wide latitude to

offer opinions, including those that are not based on firsthand knowledge or

observation.'" Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310

(2d Cir. 2008) (quoting Daubert, 509 U.S. at 592).  The trial court must "determine at

the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that

(2) will assist the trier of fact to understand or determine a fact in issue.'" Id. (quoting

Daubert, 509 U.S. at 592.  The Daubert principles apply to "'technical' and 'other

specialized' knowledge."  Id. at 311 (quoting Kumho Tire Co. v. Carmichael, 526 U.S.

137, 141 (1999)).  A district court should exclude proffered "'expert testimony based on

speculative assumptions[.]'" Id. (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d

18, 21 (2d Cir. 1996).  "An expert's opinions that are without factual basis and are

based on speculation or conjecture are simply inappropriate."  Id.

the admissibility of the rebuttal report at this time.

Defendant claims that the objective physical evidence makes Ehrlich's report speculative and scientifically unreliable. Defendant points out that Ehrlich contends "that the subject knife must have been improperly manufactured because the lock pawl was found free floating in the housing unit and because the lock pawl mechanism's lack of escape geometry would not allow a properly manufactured lock pawl to became dislodged (absent intentional removal)." (Defendant's Brief at 14). Defendant insists that Ehrlich's opinion is merely "speculative and scientifically unreliable because his analysis fails to account for the other obvious scenario where the lock pawl is properly installed but later removed." (Id. at 14-15).

The weakness of Defendant's position is underlined in this passage. Defendant contends that the report should be discounted because the expert report fails to consider "the *other* obvious scenario." (Id. at 15) (emphasis added). Here, Defendant points out that there is another explanation available for why the lock pawl was not in place at the time of the accident besides a manufacturing defect. Defendant's expert report surely offers this explanation. To be admissible, however, Plaintiff's expert report need not accept this scenario. The Court notes that Defendant's expert report likewise builds upon physical evidence, testimony and reported use to reach the conclusion that the lock pawl was removed after shipment to the consumer. Defendant's conclusion is necessarily based on circumstantial evidence, since Defendant's expert did not see the knife manufactured or examine the knife when the manufacturer shipped it. The Court cannot accept that conclusion as undisputed. In doing so, the Court would ignore its obligation to "view all of the evidence presented 'in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" LaBounty v. Coughlin,

137 F.3d 68, 73 (2d Cir. 1998) (quoting <u>American Cas. Co. v. Nordic Leasing, Inc.</u>, 42 F.3d 725, 728 (2d Cir. 1994)).  The jury must decide such issues of disputed fact, and excluding an expert report because the expert did not accept the conclusion that the Defendant insists is most likely (and which would likely lead to judgment for the Defendant) would be improper.  The Court finds the Plaintiff's expert report admissible.  Summary judgment is therefore inappropriate on the manufacturing defect claim.

### C.   Design Defect

In a design defect claim, "the relevant inquiry is 'whether the product, as designed, was not reasonably safe.'" <u>Dommes v. Best Tr. Corp.</u>, 17 N.Y.3d 594, 608 (2011) (quoting <u>Voss v. Black & Decker Mfg. Co.</u>, 59 N.Y.2d 102, 107, 450 N.E.2d 204 (1983)).  "'[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use,' and 'whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.'" <u>Hoover v. new Holland N. Am., Inc.</u>, 23 N.Y.3d 41, 53-54, 11 N.E.3d 693, 701 (2014) (quoting <u>Voss</u>, 59 N.Y.2d at 107).  Factors to be considered making this determination include: "'(1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes.'" <u>Chavez v. Delta Intl. Mach. Corp.</u>, 13 N.Y.S.2d 482 , 484-485, 130 A.D.3d 667 (2d Dept. 2015) (quoting

<u>Denny v. Ford Motor Co.</u>, 87 N.Y.2d 248, 257, 662 N.E.2d 730 (1995)).  The issue of

utility versus danger is generally one for the jury.  <u>Yun Tung Chow v. Reckitt & Colman,</u>

<u>Inc.</u>, 17 N.Y.3d 29, 33, 950 N.E.2d 113, 116 (2011).  A *prima facie* design defect case

requires a showing "that the defendant 'breached its duty to market safe products when

it marketed a product designed so that it was not reasonably safe and that the defective

design was a substantial factor in causing plaintiff's injury.'"  <u>Id.</u> at 54 (quoting <u>Voss</u>, 59

N.Y.2d at 106-107).

Plaintiff's expert alleges that the design of the subject product was unsafe

because the knife's appearance was "deceptive and misleading."  (Ehrlich Report at 5).

The knife features "a blade clamping mechanism that is used to clamp the blade and

minimize wobble."  (<u>Id.</u>).  This is mechanism is apparently a safety feature, since

"[w]hen using a sharp knife, it is safest to minimize wobble, thereby increasing control."

(<u>Id.</u> at 6).  The clamping mechanism works by means of a sliding switch on the side of

the knife.  (<u>Id.</u> at 5).  This mechanism does not lock the blade and is not intended to

lock the blade.  (<u>Id.</u>).   Still, there are "pictorials of a lock alongside the switch" for the

clamping mechanism.  (<u>Id.</u>).  If a user clamps the blade, "an image of a closed lock is

revealed on a red background."  (<u>Id.</u>).  When the blade is not clamped, an open lock

and a green background appears.  (<u>Id.</u>).  Ehrlich points out that a user would likely be

confused by this design, since "the image of the closed lock means 'locked' and the

image of an open lock means 'unlocked.'" (<u>Id.</u>).  At the same time, red usually means

"'stop'" or "'danger'" and green usually means "'go'" or "'safe.'"  (<u>Id.</u>).  Adding to this

problem, Ehrlich finds, was the fact that the written instructions accompanying the knife

did not instruct users on "the function of the blade clamp or how to use the blade clamp

15

switch." (Id.).

Defendant contends that, even conceding that the design was not safe for its intended use, the alleged defect was not the "proximate cause" of Plaintiff's injury. (Defendant's Brief, dkt. # 39-2 at 11). Defendant argues that the blade locks automatically when the user releases the blade slider mechanism and acts independently of the allegedly defective blade-clamp design. In this respect, the Court agrees with the Defendant. Plaintiff's expert does not allege that Defendant's injury was caused by the blade-clamp. The expert agrees states that the purpose of the clamp is to prevent blade wobble. No evidence in the case indicates that Plaintiff Peter Boots was injured by blade wobble, however, and the expert does not claim that he was. Since no evidence indicates that the blade-clamp design was a substantial factor in causing Plaintiff's injury, Plaintiff could not prevail if his claim was that the design defect that injured him was the blade clamp itself. See Yun Tung Chow, 17 N.Y.3d at 54 (finding that a *prima facie* design defect case requires a showing "that the defendant 'breached its duty to market safe products when it marketed a product designed so that the it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.'" Id. (quoting Voss, 59 N.Y.2d at 106-107)).

Plaintiff argues, however, that his expert report and his own testimony indicates that the design was misleading about whether the blade was actually locked in place and that this misleading design was the cause of his injury. Plaintiff contends that he was mislead into believing that the knife's blade was locked into place by the icons described above. He thought the blade could not slip and extend when he removed it from the jamb and was injured when the blade did extend. The design was therefore

confusing and contributed to Plaintiff's injury by creating this false sense of security. Plaintiff's expert report makes this argument. While the Court recognizes that Plaintiff failed to respond to Defendant's statement of material facts in proper fashion, the Court also notes that nowhere in the Defendant's statement are there facts that establish that the design of the knife did not confuse Plaintiff in this fashion. Defendant's argument instead focuses on the design of the blade clamp. Thus, with respect to the Plaintiff's claim that the knife was defectively designed because it mislead users into believing that the knife blade was locked in place when it wasn't, the Court will deny the motion for summary judgment.

### D.    Substantial Modification

Defendant next argues that summary judgment is appropriate because the subject knife was substantially modified after it left Defendant's control. Plaintiff's injury, Defendant insists, occurred because of this modification. Courts are clear that "[w]hile the manufacturer is under a nondelegable duty to design and produce a product that is not defective, that responsibility is gauged as of the time the product leaves the manufacturer's hands." Robinson v. Reed-Prentice Div. of Package mach. Co., 49 N.Y.2d 471, 479, 403 N.E.2d 440, 443 (1980). "Substantial modifications of a product from its original condition by a third party which render a safe product defective are not the responsibility of the manufacturer." Id.

Defendant argues that the evidence establishes that "the lock pawl was physically and intentionally removed after proper manufacturing." Removal of this "permanently affixed safety device" was the cause of Plaintiff's injury, since there was no locking mechanism for the blade. Defendant points out that wear on the device

indicates that the knife had been used for some time before Plaintiff's injury and therefore must have been working properly. Since the evidence establishes that the lock pawl, if properly manufactured, cannot come loose absent an intentional act by a user, Defendant argues that the evidence proves a substantial modification which precludes liability on any grounds.

The Court notes that Defendant's statement of material facts, which has been deemed unopposed by the Court, establishes that the knife's lock pawl cannot become dislodged, if properly assembled, unless the housing unit is intentionally opened and the lock pawl is physically removed. (Defendant's Statement at ¶ 42). Thus, if the undisputed facts could establish that the knife was properly assembled, the Court must conclude that the knife underwent a substantial modification to the locking mechanism and a strict liability claim cannot be raised. Defendant's argument for this claim that substantial modification occurred relies not just on the undisputed facts but on inferences and arguments made in the Defendant's expert report.

Ehrlich's report, as explained above, offers admissible evidence a jury could use to determine that the knife was defectively manufactured, and thus was shipped by the manufacturer in a defective condition. As explained above, this evidence is admissible. A jury could use that evidence to conclude that no substantial modification occurred. As such, summary judgment is inappropriate on these grounds as well.

### E. Proximate Cause

Defendant also argues that summary judgment is appropriate because Plaintiff's conduct and the methods he employed while using the product represented the sole proximate cause of his injury. Defendant submits the expert report of a biomechanical

expert, Doug Morr, to support its position. Morr contends that the methods Plaintiff used increased his chance of injury. Since Plaintiffs did not refute this report with their own biomedical expert, Defendant contends that the Court must adopt the report and grant Defendant's motion.

In New York, a plaintiff may not recover in a products liability action if "the sole proximate cause of [his] injuries was his own negligence[.]" <u>Donuk v. Sears, Roebuck & Co.</u>, 52 A.D.3d 456, 456-57, 859 N.Y.S.2d 701, 702 (2d Dept. 2008). New York courts have also pointed out that "[t]he concept of proximate cause, or more appropriately legal cause, has proven to be an elusive one, incapable of being precisely defined to cover all situations." <u>Derdiarian v. Felix Contractor Corp.</u>, 51 N.Y.2d 308, 314, 414 N.E.2d 666, 670 (1980). "Depending on the nature of the case, a variety of factors may be relevant in assessing legal cause." <u>Id.</u> at 314-15. Still, since there is a "unique nature of the injury in each case, it is for the finder of fact to determine legal cause, once the court has been satisfied that a prima facie case has been established." <u>Id.</u> at 315. To prevail, "the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." <u>Id.</u>

Defendant points to the expert report of Robert J. Mullins, II to argue that the evidence in the case indicates that Plaintiff's conduct was the sole proximate cause of his injuries.[2] Mullins argues that "[t]here is no physical evidence that the subject blade broke during the subject incident" and "no physical evidence of how much, if any, of the

---

[2]Defendant cites to Exhs. J and K to its motion for summary judgment. These exhibits are the same document, titled Mullins' "Supplemental Report." <u>See</u> Exhs. J and K to Defendant's Motion, dkt. #s 39-12 and 39-13. Both reports bear the same date.

blade extended during the subject incident." (Report of Robert J. Mullins, II, Exh. J, K, to Defendant's Motion, dkt. #s 39-12, 39-13, ("Mullins Report") at 2).  Mullins also points out "well-established precautions" exist protecting "workers form the potential hazards associated with using a tool such as the subject utility knife." (Id.).  He contends that Plaintiff endangered himself by failing to "place the plastic jamb he was cutting on a stable surface," or "clamping" the material while he was cutting it. (Id.).  These methods "increased [the] risk of the material binding against the cutting blade" and "increased [the] risk of the improper forces being applied to the knife to attempt to complete the cuts." (Id.).  Mullins finds that "[t]his incident, including the injuries sustained, are in no way dependent upon the blade extending out and then breaking off as alleged." (Id.).  He contends that "[t]his incident, and the resulting injuries, would have been avoided entirely if Mr. Boots would have followed widely accepted safety procedures." (Id.).  Using "biomechanial analysis," Mullins argues "Mr. Boots' decisions of how and where to hold the piece he was working on, and the direction and type of force he was applying to the knife, were the primary causative factors to the injury he sustained." (Id.).  His method of cutting "place[d] his left forearm in the direct path of the blade and provide[d] the mechanism necessary to cause the injury with no more than the blade length Mr. Booth reportedly selected prior to the event." (Id. at 2-3).

The facts as established by the Defendant demonstrate the Plaintiff used a method to cut the jamb and free the blade which placed him in danger.  Those facts establish that the utility knife's blade became stuck in the vinyl while Plaintiff attempted to cut the fourth cut in the jamb. (Defendant's Statement at ¶ 24).  Plaintiff attempted to free the blade by holding the jamb upright in his left hand and pulling the blade with his

right.  (Id. at ¶ 25).  This method for freeing the blade put Plaintiff's left arm in the path

of the blade.  (Id. at ¶ 26).  The blade came free from the jamb, and Plaintiff cut his left

arm between the wrist and elbow to a depth significantly less than .4 or .6 inches.  (Id.

at ¶¶ 27, 22).  There were a number of different methods that Plaintiff could have used

to free the knife from the jamb.  (Id. at ¶ 31).  He could have pushed the blade away

from his body, which would have prevented the accident.  (Id. at ¶ 31).

Summary judgment would be appropriate here if these facts established that the

"sole proximate cause" of Plaintiff Peter Boots' injury was his own conduct in cutting the

jamb and attempting to remove the stuck blade.  Courts are clear, however, that the

burden lies with the Defendant at this point to "'show that the plaintiff's conduct was the

*sole proximate cause* of [his or her] injuries.'" Rupolo v. Oshkosh Truck Corp., 749

F.Supp.2d 31, 35 (E.D.N.Y. 2010) (quoting Donald v. Shinn Fu Co., No. 99-CV-6397

(ARR), 2002 U.S. Dist. LEXIS 27967, 2002 WL 32068351, at *6 (E.D.N.Y. Sep. 4,

2002) (emphasis added).

These facts and the expert reports do not establish, however, that the *sole*

proximate cause of Plaintiff's injury was the way that he used the knife. Taking all

inferences in the Plaintiffs' favor, they simply show that the Plaintiff used a method that

endangered him.  Indeed, Mullins' report, though contending that the accident would

have been avoided if Boots had used a safer technique, also admits that  Boots' actions

"were the *primary* causative factors to the injury he sustained."  (Mullins report at 2)

(emphasis added).  The report thus equivocates.  Primary is not sole, and Defendant

has not met its burden on this basis.  A jury will have to determine the cause of

Plaintiff's injury.

## IV.    CONCLUSION

For the reasons stated above, the Court will DENY the Defendant's motion for summary judgment, dkt. #39.


IT IS SO ORDERED.

Dated: 16, 2015.


Thomas J. McAvoy
Senior, U.S. District Judge